IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DELTRINISHA ROBERTS, individually and behalf of Z.J., a minor, Plaintiff, v. ACTIVISION BLIZZARD, INC., et al., Defendants. | CIVIL ACTION FILE NO. 1:24-CV-1876-TWT |

## ORDER

This is a products liability action. There are several motions pending before the Court. Defendants Activision Blizzard, Inc., Activision Publishing, Inc., Treyarch Corp., Infinity Ward, Inc., and Sledgehammer Games, Inc. (collectively, the "Activision Defendants") have filed a Motion to Compel Arbitration [Doc. 106]. Defendants Take-Two Interactive Software, Inc. ("Take-Two") and its wholly owned subsidiaries Rockstar Games, Inc. and Rockstar Games UK Limited (collectively, the "Rockstar Games Defendants") have also filed a Motion to Compel Arbitration [Doc. 110]. The Court GRANTS these motions and will address them in detail below.[1]

Two Motions to Dismiss are also pending. Defendant Robolox Corporation filed one [Doc. 107] and Defendants Activision, Take-Two, and Rockstar Games collectively filed another [Doc. 112]. Because the Court is granting the motions to compel

---

[1] There are two additional motions to compel arbitration pending on the docket [Docs. 52, 70]. These motions are DENIED as moot because some of the Defendants that filed the motions have been voluntarily dismissed, and the remaining Defendants filed renewed motions to compel arbitration.

arbitration, these Motions to Dismiss are DENIED without prejudice.

## I. Background

Plaintiff Deltrinisha Roberts brings this case individually and on behalf of her child, Z.J. This case arises from Z.J.'s long-term use of several popular video games including Call of Duty and Grand Theft Auto V ("GTA V"). (Am. Compl. ¶ 95). Z.J. is sixteen, and has played video games for the past eight years. (*Id.* ¶¶ 93–94). The Activision Defendants produce the Call of Duty games, and the Rockstar Games Defendants produce the Grand Theft Auto games. (*Id.* ¶¶ 55–70; 72–83). The Plaintiffs allege that the Activision Defendants and the Rockstar Games Defendants produced these video games to "intentionally . . . cause addictive and disordered use of the products that specifically target one's brains, and particularly the brains of minors and neurodivergent users." (*Id.* ¶ 165). The Plaintiffs assert that Z.J. now suffers from video game addiction because of his use of the Defendants' games. (*Id.* ¶ 27).

The Plaintiffs claim that the Defendants are liable for their actions under various state and federal laws, as outlined in the eleven Counts they assert in the Amended Complaint. (*Id.* ¶¶ 443–731). The Activision and Rockstar Games Defendants argue that these claims are subject to mandatory arbitration. (Activision Def.'s Mot. to Compel, [Doc. 106]); (Rockstar Games Def.'s Mot. to Compel, [Doc. 110]).

The Court will discuss these arguments below.

## II. Legal Standard

The Federal Arbitration Act ("FAA") "embodies a liberal federal policy favoring arbitration agreements." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005) (quotation marks omitted). Section 2 of the Act provides in relevant part:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . .

9 U.S.C. § 2. On a motion to compel arbitration, a court undertakes a two-step inquiry to determine (1) whether the parties agreed to arbitrate the dispute in question and, if they did, (2) whether legal constraints external to their agreement foreclose arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628 (1985). Courts apply state contract law to questions of the validity, revocability, and enforceability of arbitration agreements. *See Caley*, 428 F.3d at 1368. An arbitration clause may be unenforceable for the same reasons as any other contract, such as fraud or unconscionability. *See Mitsubishi*, 473 U.S. at 627. Or there may be statutory barriers to arbitration, such as a congressional intention to adjudicate certain substantive rights solely in a judicial forum. *See id.* at 628. When an arbitration agreement clears both prongs of the FAA test, a court must either stay or dismiss the lawsuit and compel arbitration. *See Lambert v. Austin Ind.*, 544 F.3d

1192, 1195 (11th Cir. 2008).

## III.    Discussion

### A. Whether Agreements to Arbitrate Exist

The Plaintiffs oppose arbitration because they allege that no arbitration agreement exists. This issue is governed by state law. *See Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016) (noting that the Eleventh Circuit "consistently [has] held that state law governs the issue of the existence of an agreement to arbitrate under the FAA"). According to the choice-of-law provisions in the agreements at issue, Delaware law applies to Activision's Terms Of Use and End User License Agreement, (Activision Def.'s Mot. to Compel, Ex. A [Doc. 106-5], at 6), and New York law applies to Rockstar Games' End User License Agreement and Terms Of Service, (Rockstar Games Def.'s Mot. to Compel, Ex. A [Doc. 110-2], at 20). The Court will assess the contracts accordingly.[2]

### 1. The Activision Defendants

#### a. The Agreements at Issue

Both the End User License Agreement and Terms Of Use contain a nearly

---

[2]    The Court notes that all parties cite Georgia law in their briefs. The Activision Defendants contend that Georgia law ought to apply, as the choice-of-law provisions in the agreements should not determine the applicable state law that should be used to assess motions to compel arbitration. (Activision Def.'s Reply Br. to Activision Defs.' Motion to Compel [Doc. 121], at 7 n.2). The Activision Defendants do acknowledge, however, that the outcome should be the same under either Georgia or Delaware state law. (*Id.*). For consistency with related cases before this Court and because this issue is not addressed by the parties, the Court will abide by the parties' agreements and use the state law specified by the choice-of-law provisions.

4

identical notice in all caps and bold lettering that states: "IMPORTANT NOTICE: THIS AGREEMENT IS SUBJECT TO BINDING ARBITRATION AND A WAIVER OF CLASS ACTION RIGHTS." (*Id.*, Ex. C [Doc. 106-7], at 1 ("Activision Defs.' TOU")); (*Id.*, Ex. D. [Doc. 106-8], at 1 ("Activision Defs.' EULA")). Both the TOU and EULA's arbitration clauses state:

> READ THIS SECTION CAREFULLY. IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING WAIVING YOUR RIGHT TO FILE A LAWSUIT IN COURT OR TO PURSUE CLAIMS IN A CLASS OR REPRESENTATIVE CAPACITY.
>
> . . .
>
> To the fullest extent allowed by applicable law, you and Activision agree to submit all Disputes between us to individual, binding arbitration pursuant to the provisions in this Section 4. A "Dispute" means any dispute, claim, or controversy (except those specifically exempted below) between you and Activision that in any way relates to or arises from any aspect of our relationship, including, without limitation, your use or attempted use of the Product, all marketing related to the Product, all Services, Service Provided Content, and Virtual Currency, any licensed content, and all matters relating to or arising from this Agreement (including Activision's Privacy Policy and all other terms incorporated into this Agreement) or any other agreement between you and Activision, including any disputes over the validity or enforceability of this agreement to arbitrate. A Dispute shall be subject to these BINDING ARBITRATION AND CLASS ACTION WAIVER provisions regardless of whether it is based in contract, statute, regulation, ordinance, tort (including fraud, misrepresentation, fraudulent inducement, or negligence), or any other legal or equitable theory. This includes claims or requests for relief that accrued before you entered into this Agreement.

(Activision Defs.' TOU ¶ 4); (Activision Defs.' EULA ¶ 16). The delegation provision provides:

> The arbitrator shall determine the scope and enforceability of this

arbitration agreement, including whether a Dispute is subject to arbitration. The arbitrator has authority to decide all issues of validity, enforceability or arbitrability, including, but not limited to, where a party raises as a defense to arbitration that the claims in question are exempted from the arbitration requirement or that any portion of this agreement is not enforceable.

(*Id.*). Both agreements also contain an opt-out provision, which provides:

You have the right to opt-out and not be bound by the arbitration agreement and class action waiver provisions in this [subsection] by sending written notice of your decision to opt-out . . . . The notice must be sent within 30 days of purchasing the Product (or if no purchase was made, then within 30 days of the date on which you first access or use the Product and agree to these terms); otherwise you shall be bound to arbitrate disputes in accordance with the terms of this [subsection].

(*Id.*).

Call of Duty players interact with these provisions in several ways.[3] To start, the terms and conditions themselves maintain that users agrees to the TOU and EULA by the act of playing the game. (Bent Decl. ¶ 4). Further, a user cannot access Call of Duty without accepting the terms and conditions. (*Id.* ¶ 12). The first time a user plays certain Call of Duty games, the player must scroll through and accept the TOU and EULA before the game will start. (*Id.* ¶ 9). Users also must affirmatively agree to the TOU and EULA when creating an Activision/Call of Duty account. (*Id.*

---

[3] In support of their arguments, the Activision Defendants provided the declaration of Geoffrey Bent, a senior producer in the Production Management Group at Activision Publishing, Inc. (Activision Def.'s Mot. to Compel, Ex. 4 [Doc. 106-4], ¶ 1 ("Bent Decl.")). Bent explains that his responsibilities include working with the design studios and legal departments "to ensure that our [EULAs and TOU] are implemented in-game as part of the player's initial flow into game-play" and that, based on his role, he is personally familiar with the EULA and TOU at issue in this lawsuit. (*Id.*).

¶¶ 5–7).

### b. Analysis

The Activision Defendants contend that the parties entered into a valid arbitration agreement because Z.J. accepted Activision's TOU and EULA multiple times by playing the games, by creating an Activision and/or Call of Duty account, and by affirmatively agreeing to the TOU and EULA. (Activision Def.'s Mot. to Compel [Doc. 106], at 4–5). Activision asserts that its TOU and EULA contain binding arbitration agreements that include delegation provisions.

Under Delaware law, the party seeking to enforce a contract bears the burden of proving the contract's existence and terms. *See Schwartz v. Chase*, 2010 WL 2601608, at *4 (Del. Ch. June 29, 2010). "A valid contract requires an offer, acceptance, and consideration, and the parties must have intended that the contract would bind them. Additionally, a contract must contain all material terms in order to be enforceable, and those terms must be sufficiently definite." *Shilling v. Shilling*, 332 A.3d 453, 462 (Del. 2024) (quotation marks and citations omitted).

To start, "[c]lickwrap agreements are routinely recognized by courts and are enforceable under Delaware law." *Doe v. Massage Envy Franchising, LLC*, No. CV S20C-05-005RFS, 2020 WL 7624620, at *2 (Del. Super. Ct. Dec. 21, 2020). The Plaintiffs acknowledge that "the Activision TOU and Activision EULA include a binding arbitration language containing an arbitration provision." (Pls.' Resp. Br. in

Opp'n to Activision Defs.' Mot. to Compel [Doc. 116], at 6). Rather, the Plaintiffs argue that the Activision Defendants have not provided adequate proof of an agreement with Roberts or Z.J. because they did not provide evidence that (1) Z.J. affirmatively accepted the TOU or EULA, and (2) he created an Activision or Call of Duty Account. (*Id.* at 6–7).

The Plaintiffs' arguments lack merit. First, the Court finds that the Activision Defendants presented sufficient evidence that the terms of the TOU and EULA apply to Call of Duty titles that Z.J. played. For example, Roberts avers that Z.J. "has played and/or continues to play" Call of Duty games such as "Call of Duty: Black Ops Cold War." (Pls.' Resp. Br. in Opp'n to Activision Defs.' Mot. to Compel, Ex. 1 [Doc. 116-1] at ¶ 8 n.1 ("Roberts Decl.")). And Bent confirms that "[a]ll relevant provisions of the currently effective Terms of Use applicable to Call of Duty: Black Ops Cold War are identical" to the language quoted from the newest Call of Duty game. (Bent Decl. ¶ 14). He then further validates that "[a]ll Call of Duty games developed and sold since 2019, including Call of Duty: Black Ops Cold War, include an in-game Terms of Use and EULA" and avers that "[t]he first time a player plays Call of Duty: Black Ops Cold War, they must scroll through and 'accept' the Terms of Use and EULA before they can proceed to play the game." (*Id.* ¶ 9).

The Court finds that a valid agreement to arbitrate was entered into under Delaware law. The Activision Defendants offered Z.J. the opportunity to play or continue playing Call of Duty in exchange for his agreement to the EULA and TOU,

and in consideration for his agreement, he could continue playing the game. *Shilling*, 332 A.3d at 462. The Plaintiffs do not argue that Z.J. did not intend to be bound by any agreement he may have accepted, nor could they, given the EULA and TOU's bold, capitalized caution of the binding nature of the arbitration agreement. (Activision Defs.' TOU, at 1); (Activision Defs.' EULA, at 2).

The Plaintiffs rely on *Bazemore* as support for their position that they cannot be compelled to arbitrate because the Activision Defendants have not presented evidence that they actually agreed to the EULAs and TOU, but the facts are distinguishable. *See Bazemore*, 827 F.3d at 1325. In *Bazemore*, the Eleventh Circuit refused to enforce an arbitration agreement in a credit cardholder agreement that was allegedly mailed to the plaintiff after she opened a credit card with the defendant. *Id.* at 1332. The Eleventh Circuit decided this in part because the defendant had not provided any "competent evidence" that a copy of the agreement was ever sent to the plaintiff or that the terms it sought to enforce were contained "in the form of any agreement" that would have been sent to the plaintiff. *Id.* at 1333–34. Here, there is competent, unrebutted evidence of the arbitration and delegation provisions that Z.J. agreed to. The Activision Defendants provided exact copies of the agreements at issue along with Bent's declaration supporting the presentation of the agreements to Call of Duty players. Similarly, as to the Rockstar Games Defendants, there is competent, unrebutted evidence that the version of the Terms of Service ("TOS") and End-User License Agreement ("EULA") containing the arbitration and delegation provisions at

issue were presented to Z.J. in 2020 and 2024, when Z.J.'s aliases accessed online gameplay. The Rockstar Games Defendants provided exact copies of the agreements at issue along with Andrew Ungberg's declaration supporting the presentation of the agreements to GTA V players.

The Plaintiffs' assertion that the Activision Defendants' motion should fail because they have not identified an Activision and/or Call of Duty account for Roberts or Z.J. is also unpersuasive. It is true that discovery has not yet commenced, and the Plaintiffs are not obligated to respond to the Activision Defendants' counsel's request for this information. But the Plaintiffs' conclusory assertions that the Activision Defendants' motion must fail because they have not presented evidence that Roberts or Z.J. actually agreed to the EULA and TOU, while simultaneously refusing to confirm the account credentials that would have allowed the Activision Defendants to present such evidence, does not create a "genuine" dispute of material fact. *Bazemore*, 827 F.3d at 1333 ("A dispute is not genuine if it is unsupported by the evidence or is created by evidence that is merely colorable or not significantly probative." (quotation marks and citations omitted)). This conclusion is buttressed by Roberts's acknowledgment that "at some point Z.J. was required by the Activision Defendants to create an account to keep playing [Call of Duty] games." (Roberts Decl. ¶ 19).

The Plaintiffs also argue that no agreement exists between Roberts and the Activision Defendants because she has never played Call of Duty, never created a

Call of Duty account, and never personally agreed to Activision Defendants' TOU or EULA. However, both the TOU and EULA mandate that if a player is between thirteen and eighteen years old, parental consent is required to play the game. (Bent Decl. ¶¶ 14–15; *Id.*, Ex. C. at 1 –2, 12; *Id.*, Ex. D at 1; *Id.*, Ex. E at 1). So, when Z.J. accepted the arbitration provisions, he represented to Activision that Roberts had agreed to the TOU and EULA.

The doctrine of apparent authority is relevant here. The Supreme Court of Delaware has defined apparent authority as "the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Caribbean Sun Airlines Inc. v. Halevi Enters. LLC*, No. 199, 2024, 2025 WL 250787, at *6 (Del. Jan. 21, 2025) (quotation marks and citation omitted). "If a third party relies on this apparent authority in good faith and is justified in doing so by the surrounding circumstances, the principal is bound to the same extent as if actual authority existed." *Id.* (quotation omitted). Apparent authority may bind a nonsignatory to an arbitration agreement. *BuzzFeed, Inc. v. Anderson*, No. 2022-0357-MTZ, 2022 WL 15627216, at *8 (Del. Ch. Oct. 28, 2022) (noting that "[c]ourts have 'recognized five theories for binding nonsignatories to arbitration agreements" including "agency").

Here, the Activision Defendants justifiably relied on Z.J.'s representation that Roberts had consented to the TOU and EULA. Thus, Roberts is bound to the

arbitration agreement under the doctrine of apparent authority. Other courts have also reached this conclusion when assessing similar situations. *See Dunn v. Activision Blizzard, Inc.*, No. 3:23-cv-224-JM, 2024 WL 4652194, at *4 (E.D. Ark. Oct. 31, 2024) (holding that a parent was bound to arbitrate their claims against the defendants because "Activision Defendants were justified in believing that the user of the accounts possessed the authority to agree to the EULA. There was no reason for the Activision Defendants to question whether the user of the account was anyone other than [the parents] or someone to whom they gave authority"). Accordingly, the Court finds that Roberts is bound to the arbitration agreements to the same extent as Z.J. and the Plaintiffs arguments to the contrary fail.

The Court also rejects the Plaintiffs' contention that the parental consent language in the TOU and EULA qualifies as a condition precedent that prevents contract formation. Under Delaware law, a condition precedent is "an act or event, other than a lapse of time, that must exist or occur *before* a duty to perform something promised arises." *Nucor Coatings Corp. v. Precoat Metals Corp.*, No. N22C-11-222 MAA CCLD, 2023 WL 6368316, at *11 (Del. Super. Ct. Aug. 31, 2023) (quotation marks and citation omitted). Conditions precedent are not favored and must be unambiguous. *Id.* ("Conditions precedent are not favored in contract interpretation because of their tendency to work a forfeiture. Because of the risk of forfeiture, a provision must employ unambiguous language to qualify as a condition precedent."

(quotation and citations omitted)).

The Court finds that the parental consent language is not a condition precedent. As a different court facing this issue held, the parental consent language in the Activision Defendants' contract "reads more like a promise that the parent had given (or would give) consent. The phrase 'your parent or legal guardian must consent to this agreement' is unlinked to either party's duty to perform and leaves open how and when the consent should occur." *Angelilli v. Activision Blizzard, Inc.*, No. 23-cv-16566, 2025 WL 524276, at *5 (N.D. Ill. Feb. 18, 2025). Further, the parental consent language in Activision's TOU and EULA does not specify the consequences of non-performance, and thus cannot be recognized as a condition precedent under Delaware law. *See Blue Cube Spinco LLC v. Dow Chem. Co.*, No. cv N21C-01-214 PRW CCLD, 2021 WL 4453460, at *11 (Del. Super. Ct. Sept. 29, 2021) ("When a provision guised by a party as a condition precedent does not identify the way in which it can be enforced, it will not be recognized as a condition precedent." (citation omitted)). Therefore, the parental consent language is not a condition precedent, and the Plaintiffs' argument on this point fails.

The Plaintiffs' other arguments against the arbitration agreements relate to Z.J.'s legal ability to contract. The Plaintiffs argue that Z.J. was not competent to assent to the arbitration agreement because lacked capacity and competency to understand the terms due to his age. (Pls.' Resp. Br. in Opp'n to Activision Defs.' Mot. to Compel [Doc. 116], at 16). She also argues that his alleged video game addiction

also diminished his capacity and competency to contract. *Id.* at 16–17. Under Delaware law, these challenges go to the voidability of a contract rather than its validity. *See Kuehn v. Cotter*, 77 A.3d 272, 272 (Del. 2013) (contract made by a minor "was voidable, not void."); *Bettis v. Premier Pool & Prop. Mgmt., LLC*, 2012 WL 4662225, at *2 (Del. Ch. Sept. 26, 2012) (noting that if incapacity is established, "the contract may be declared voidable"); *King v. Cordrey*, 177 A. 303, 306 (Del. Super. Ct. 1935) (discussing disaffirmance as a defense to avoid a contract entered into by a minor). As discussed in the delegation section below, these challenges must be assessed by the arbitrator and do not affect the Court's determination that a contract exists here. In sum, the Activision Defendants have shown that a valid agreement to arbitrate exists.

### 2. The Rockstar Games Defendants

#### a. The Agreements at Issue

New York law also mandates that the party seeking to enforce a contract bears the burden of proving the contract's existence and terms. *See Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.*, 206 A.D.2d 166, 169 (1994). The Rockstar Games Defendants contend that the parties entered into a valid arbitration agreement because Z.J. accepted their TOS and EULA which both contain binding arbitration agreements. The Rockstar Games Defendants' TOS and EULA both contain arbitration provisions with delegation provisions with notices in all capital letters. For example, the TOS provides that

THIS AGREEMENT CONTAINS A MANDATORY ARBITRATION CLAUSE AND A WAIVER OF CLASS ACTION AND JURY TRIAL RIGHTS FOR ALL USERS RESIDING IN THE UNITED STATES . . . UNLESS YOU OPT-OUT VIA THE PROCESS IN SECTION 15.5(3), YOU WILL BE BOUND BY THE ARBITRATION AGREEMENT, WHICH MEANS THAT YOU AND ROCKSTAR WILL BE REQUIRED TO RESOLVE ANY DISPUTE, SUBJECT TO LIMITED EXCEPTIONS, BY FINAL AND BINDING INDIVIDUAL ARBITRATION. THE ARBITRATION CLAUSE WAIVES YOUR RIGHT TO A JURY TRIAL, AND TO PARTICIPATE IN CLASS ACTION, COLLECTIVE ACTIONS, AND ALL OTHER TYPES OF COURT PROCEEDINGS.

. . .

PLEASE READ THIS SECTION CAREFULLY – IT AFFECTS YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE A LAWSUIT IN COURT AND TO HAVE A JURY HEAR YOUR CLAIMS. … You and Rockstar agree that, if not resolved through the informal negotiation process described below, any Disputes between us shall be exclusively resolved by individual, binding arbitration under this Arbitration Agreement. Subject to the exclusions in Section 15.5(10), a "Dispute" means any dispute, claim, or controversy arising from or related to the Services, including those related to the formation, breach, termination, enforcement, scope, validity, or applicability of the Agreement or the Arbitration Agreement, or your rights under those agreements. … The arbitrator – not a federal, state, or local court, or government agency – shall have exclusive authority to resolve any Disputes, including those related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, and any claim that all or part of the Arbitration Agreement is void or voidable. The arbitrator shall also have authority to determine all threshold arbitrability issues, including related to whether the Agreement or the Arbitration Agreement are unconscionable or illusory; whether the Arbitration Agreement has been disaffirmed under applicable law; and any defense to arbitration including waiver, delay, laches, or estoppel.

(Rockstar Games Defs.' Mot. to Compel Ex. B [Doc. 110-2] at 22, 39–40 ("Rockstar Games Defs.' TOS")). And the EULA similarly alerts users in all capital letters that

THIS AGREEMENT CONTAINS A BINDING INDIVIDUAL

ARBITRATION AND CLASS ACTION WAIVER PROVISION IN THE 'BINDING INDIVIDUAL ARBITRATION' SECTION THAT AFFECTS YOUR RIGHTS UNDER THIS AGREEMENT WITH RESPECT TO ANY 'DISPUTE' (AS DEFINED BELOW) BETWEEN YOU AND THE COMPANY, AND REQUIRES YOU AND THE COMPANY TO RESOLVE DISPUTES IN BINDING, INDIVIDUAL ARBITRATION, AND NOT IN COURT.

. . .

You and the Company agree that should any dispute, claim, or controversy arise between us regarding any Company products or services (hereafter a "Dispute"), whether based in contract, statute, regulation, ordinance, tort (including fraud, misrepresentation, fraudulent inducement, or negligence), or any other legal or equitable theory, except for those matters listed in the Exclusions From Arbitration paragraph below, and expressly including the validity, enforceability, or scope of this 'BINDING INDIVIDUAL ARBITRATION' section (with the exception of the enforceability of the Class Action Waiver clause below), shall be submitted to binding arbitration, as described below, rather than being resolved in court. The term "Dispute" is to be given the broadest possible meaning that will be enforced and includes, for example, all matters arising under this Agreement, the Privacy Policy, the Terms of Service, or any other agreement with the Company.

(Rockstar Games Defs.' Mot. to Compel Ex. A [Doc. 110-2], at 8, 18 ("Rockstar Games Defs.' EULA")).

Both the TOS and EULA contain provisions stipulating that players can opt out of the arbitration provision if they provide notice within thirty days. (Rockstar Games Defs.' EULA, at 18) ("IF YOU WISH TO OPT OUT OF THIS BINDING INDIVIDUAL ARBITRATION REQUIREMENT, YOU MUST NOTIFY US IN WRITING WITHIN 30 DAYS OF THE DATE THAT YOU ACCEPT THIS AGREEMENT BUT ARE OPTING OUT OF BINDING INDIVIDUAL

16

ARBITRATION, UNLESS A LONGER PERIOD IS REQUIRED BY APPLICABLE LAW."); (Rockstar Games Defs.' TOS, at 40) ("You have the right to opt out of this Arbitration Agreement. You must notify us in writing within 30 days of the date that you first accept this Agreement ('Opt-Out Notice') unless a longer period is required by applicable law.").

Users interact with the TOS and EULA in several ways. First, creation of an online account, called a Social Club account, requires a player to accept the TOS and EULA. (Rockstar Games Defs.' Mot. to Compel [Doc. 110-2] ¶ 9 ("Ungberg Decl.")).[4] Players must also agree to the TOS and EULA when buying GTA V through Rockstar Games' direct-to-consumer channel or through the Microsoft Xbox Store or the Sony PlayStation Store. (*Id.* ¶¶ 9, 10). If playing the game on a PC, whether installed from a physical disc or a digital download, the user must sign in to or create a Social Club account, which, again, requires accepting the TOS and EULA. (*Id.* ¶ 11). Players must also accept the TOS and EULA when they first join an online gameplay session for GTA V. (*Id.* ¶ 12). All players must accept the EULA to play GTA V online but do not have to accept it to play the game offline. (*Id.* ¶¶ 6, 16).

The Rockstar Games Defendants aver that Z.J. plays GTA V using two aliases, both of which agreed to the EULA and TOS to play online. (*Id.* ¶ 7). The Plaintiffs

---

[4] In support of their arguments, the Rockstar Games Defendants provided the declaration of Andrew J. Ungberg, the senior director and counsel at Take-Two. Ungberg affirms that he has personal knowledge of the facts at issue in this case (Ungberg Decl. ¶ 3).

confirm that access to gameplay hinges on a player's acceptance of the TOS and EULA. (Am. Compl. ¶ 429).

### b. Analysis

Much of the debate is similar to the Court's above discussion of the Activision Defendants. Under New York law, "courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Wu v. Uber Techs., Inc.*, No. 90, 2024 WL 4874383, at *5 (N.Y. Nov. 25, 2024) (citations omitted). As before, the Plaintiffs do not argue against the substance of the arbitration agreements but contend that the Rockstar Games Defendants have not shown that Z.J. or Roberts actually entered into a contract. And as before, the Court disagrees.

Roberts herself confirmed that Z.J. used the aliases and email addresses listed by the Rockstar Games Defendants to play GTA V. (Roberts Decl. ¶ 34). The Rockstar Games Defendants have shown that these aliases agreed to the EULA and TOS when accessing online gameplay, and Z.J. specifically remembers having to "click through some boxes" before playing GTA V. (Ungberg Decl. ¶ 7); (Roberts Decl. ¶ 35). The Rockstar Games Defendants also identified, and included as exhibits, the exact language it used in the EULA and TOS. *See* (Rockstar Games Defs.' TOS); (Rockstar Games Defs.' EULA).

The Court finds that the Rockstar Games Defendants have shown that the parties entered into a valid agreement to arbitrate. As above, the Rockstar Games

Defendants offered Z.J. the opportunity to play or continue playing GTA V in exchange for his agreement to the EULA and TOS, and in consideration for his agreement, he continued playing the game. *See Wu v. Uber Techs., Inc.*, 186 N.Y.S.3d 500, 531–32 (N.Y. Sup. Ct. 2022) (holding that the plaintiff agreed to an arbitration agreement because she "was on inquiry notice of both the January 2021 Terms and the Arbitration Agreement, assented to both through conduct that a reasonable person would understand to constitute assent (*i.e.*, clicking the checkbox and the 'Confirm' button), and, therefore, is bound to them"), *aff'd*, 197 N.Y.S.3d 1 (N.Y. App. Div. 2023), *aff'd*, No. 90, 2024 WL 4874383 (N.Y. Nov. 25, 2024).

The Plaintiffs' remaining arguments fail for the reasons explained above. As with the Activision contracts, the TOS and EULA at issue here include language requiring parental consent. (Rockstar Games Defs.' EULA, at 8 ("IF YOU ARE UNDER THE LEGAL AGE OF MAJORITY, YOUR PARENT OR LEGAL GUARDIAN MUST CONSENT TO THIS AGREEMENT."); (Rockstar Games Defs.' TOS, at 23) ("Minors under 18 . . . must ask their parent or guardian to review and explain this Agreement to them, and to agree to this Agreement on their behalf.").

The Court again holds that Roberts is bound to the arbitration agreement due to Z.J.'s representation that he or she had parental consent. Under the doctrine of apparent authority, Roberts is bound to the agreement to the same extent as Z.J. *See Ne. & Cent. Contractors, Inc. v. Quanto Cap., LLC*, 165 N.Y.S.3d 111, 114 (N.Y. App. Div. 2022) ("[A] nonsignatory may be bound to an arbitration agreement if so dictated

by the ordinary principles of contract and agency. Thus, an agent acting within the scope of its authority may bind a principal to arbitration in connection with a particular transaction." (quotation marks and citations omitted); *see also Lisi v. N.Y. Ctr. for Rehab. & Nursing*, 206 N.Y.S.3d 688, 690 (N.Y. App. Div. 2024) (noting that "the existence of apparent authority depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal—not the agent").

The Court also rejects the Plaintiffs' argument that the parental consent language is a condition precedent, for the reasons articulated above. *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995) ("In determining whether a particular agreement makes an event a condition courts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition. This interpretive preference is especially strong when a finding of express condition would increase the risk of forfeiture by the oblige." (citation omitted)). Lastly, the Court again holds that the Plaintiffs' arguments relating to Z.J.'s legal ability to contract must be reserved for the arbitrator to decide, as discussed below.

### c. Conclusion

For all these reasons, the Court finds that the Activision Defendants and the Rockstar Games Defendants have carried their burdens of demonstrating valid agreements to arbitrate under Delaware law and New York law, respectively. As

these agreements contain delegation clauses, the Court must assess whether the parties delegated determination of those challenges to the arbitrator. The Court turns to that analysis next.

## B. Whether the Delegation Clauses are Enforceable

Both the Activision Defendants' EULA and TOU and the Rockstar Games Defendants' EULA and TOS contain delegation clauses. The Eleventh Circuit has described these types of clauses as "[a]n agreement to arbitrate threshold arbitrability issues . . . because [they] delegate[] the resolution of disputes about the arbitrability of the parties' claims to an arbitrator." *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1295 (11th Cir. 2022) (citation omitted). "A delegation agreement is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* (quotation marks and citation omitted). Thus, courts must analyze a delegation clause as another arbitration agreement. If the court finds that the parties have "clearly and unmistakably agreed" to delegate threshold arbitrability issues to an arbitrator, it must enforce the clause unless the court finds merit to a specific challenge to the "validity or enforceability of the parties' precise agreement to arbitrate threshold arbitrability issues." *Id.* at 1296, 1302 (quotation marks and citation omitted). "But if the court finds that the challenge to the validity or enforceability of the delegation agreement lacks merit—or if no such challenge is made—the court must enforce the delegation agreement and send any

challenges to the validity or enforceability of the primary arbitration agreement to the arbitrator." *Id.* at 1304 (citation omitted).

### 1. The Activision Defendants' Delegation Clause

As a reminder, the Activision Defendants' delegation provision provides that the parties agree to arbitrate "the scope and enforceability of this arbitration agreement, including whether a Dispute is subject to arbitration." (Activision Defs.' TOU ¶ 4); (Activision Defs.' EULA ¶ 16). The clause specifies that the arbitrator is empowered "to decide all issues of validity, enforceability or arbitrability, including, but not limited to, where a party raises as a defense to arbitration that the claims in question are exempted from the arbitration requirement or that any portion of this agreement is not enforceable." *Id.*

The Plaintiffs object to the delegation provision for several reasons. They contend that: (1) Z.J. disaffirmed both the delegation and arbitration provisions by filing this lawsuit; (2) Z.J. lacked the capacity to agree to either provision due to his age and video gaming addiction; and (3) the delegation and arbitration provisions are unconscionable for a variety of reasons. (Pls.' Resp. in Opp. to the Activision Defs.' Mot. to Compel, at 18–24).

First, the Court finds that the delegation clause satisfies *Attix*'s "clear and unmistakable" language requirement as the parties plainly agreed to delegate issues concerning the validity and enforceability of the arbitration provisions to the arbitrator, as well as questions of whether a dispute is subject to arbitration in the

first place. *Attix*, 35 F.4th at 1296.

Next, the Plaintiffs' arguments against enforceability of the delegation provision lack merit. None of their objections specifically challenge the delegation provision's validity or enforceability apart from the contract's validity or enforceability as a whole. Therefore, the objections do not constitute valid arguments against enforcement because the challenge to the delegation provision must "differ from a challenge only to the validity or enforceability of [the] primary arbitration agreement." *Id.* at 1304; *see also id.* ("A party specifically challenges the validity or enforceability of a delegation agreement if, and only if, the substantive nature of the party's challenge meaningfully goes to the parties' precise agreement to delegate threshold arbitrability issues." (citation omitted)).

The Plaintiffs' disaffirmance and capacity challenges seek to void the entire arbitration agreement, not just the delegation provision. The unconscionability challenge, though more nuanced, also lacks the required specificity. They argue that both the arbitration and delegation provisions are unconscionable for several reasons including: (1) Z.J. was a minor when any agreement was allegedly made and he lacked capacity due to the severity of his addiction; (2) the parties thus lacked equal bargaining power; (3) neither Z.J. nor Roberts were required to affirmatively read the TOU or EULA's terms before accepting; and (4) the Activision Defendants failed to warn Z.J. and Roberts of the addictive nature of its products and, if they had, they would not have agreed to the arbitration and delegation provisions. (Pls.' Resp. in

Opp. to the Activision Defs.' Mot. to Compel, at 20–24). But these arguments go against the EULA as a whole, not just the delegation provision. *See Attix*, 35 F.4th at 1305.

For these reasons, the Plaintiffs' challenges to the delegation provision fail, and the Court must send his challenges to the validity or enforceability of the arbitration provision—including his infancy, capacity, disaffirmance, and unconscionability arguments—to the arbitrator. *Id.* at 1303.

### 2. The Rockstar Games Defendants' Delegation Provision

The Rockstar Games Defendants' delegation provision in the TOS provides that

> The arbitrator – not a federal, state, or local court, or government agency – shall have exclusive authority to resolve any Disputes, including those related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, and any claim that all or part of the Arbitration Agreement is void or voidable. The arbitrator shall also have authority to determine all threshold arbitrability issues, including related to whether the Agreement or the Arbitration Agreement are unconscionable or illusory; whether the Arbitration Agreement has been disaffirmed under applicable law; and any defense to arbitration including waiver, delay, laches, or estoppel.

(Rockstar Games Defs.'s TOS, at 22, 39–40). And the delegation provision in the EULA is similar:

> You and the Company agree that should any dispute, claim, or controversy arise between us regarding any Company products or services (hereafter a "Dispute"), whether based in contract, statute, regulation, ordinance, tort (including fraud, misrepresentation, fraudulent inducement, or negligence), or any other legal or equitable theory, except for those matters listed in the Exclusions From Arbitration paragraph below, and expressly including the validity, enforceability, or scope of this 'BINDING INDIVIDUAL

24

> ARBITRATION' section (with the exception of the enforceability of the Class Action Waiver clause below), shall be submitted to binding arbitration, as described below, rather than being resolved in court. The term "Dispute" is to be given the broadest possible meaning that will be enforced and includes, for example, all matters arising under this Agreement, the Privacy Policy, the Terms of Service, or any other agreement with the Company.

(Rockstar Games Defs.' EULA at 8, 18). The Court also finds that this language is sufficiently "clear and unmistakable" to demonstrate that the parties intended to delegate issues of enforceability of the arbitration agreement to the arbitrator. *Attix*, 35 F.4th at 1296. The Plaintiffs' arguments against the delegation provision largely mirror their arguments against the Activision Defendants' EULA and TOU. (Pls.' Resp. in Opp. to the Rockstar Games Defs.' Mot. to Compel, at 16–22). The Court rejects them for the same reasons as above.

The Plaintiffs do raise one unique argument against the Rockstar Games Defendants' delegation provisions. They contend that their claims are outside the scope of the arbitration agreement because "[t]here is no agreement to arbitrate claims arising out of videogame addiction." *Id.* at 23. They assert that their claims fall outside the scope of the arbitration agreement because video game addiction does not arise out of "performance of the contract," as specified in the arbitration agreement. (Pls.' Resp. in Opp. to the Rockstar Games Defs.' Mot. to Compel, at 24).

Again, this question must go to the arbitrator. The Rockstar Games Defendants' delegation provision designates exclusive authority to the arbitrator to decide arguments relating to the "*interpretation*, applicability, enforceability, or

25

formation of this Arbitration Agreement." (Rockstar Games Defs.' TOS, at 22, 39–40 (emphasis added)). And the Plaintiffs' argument on this point is not questioning the delegation provision specifically but the applicability of the entire arbitration agreement to their claims. So this argument against arbitration also fails. Accordingly, the Court holds that the Plaintiffs must send their challenges to the EULA and TOS's arbitration provisions—including their infancy, capacity, disaffirmance, scope, and unconscionability arguments—to the arbitrator.

## C. Whether Arbitration Should Be Compelled

Having found that the Plaintiffs agreed to arbitrate all of the claims they assert in this action against the Activision Defendants and the Rockstar Games Defendants and that no legal constraints foreclose arbitration, the Court will compel the Plaintiffs to submit their claims to arbitration. And because the Court compels arbitration of all of the Plaintiffs' claims, the Rockstar Games Defendants' and the Activision Defendants' Motions to Dismiss will be denied without prejudice to refiling should the arbitrator return this action to the Court.

## IV. Conclusion

For these reasons, the Activision Defendants' Motion to Compel Arbitration [Doc. 106] is GRANTED. The Rockstar Games Defendants' Motion to Compel Arbitration [Doc. 110] is also GRANTED. The Activision Defendants' Motion to Dismiss [Doc. 112] is DENIED without prejudice. The Defendant Robolox Corporation's Motion to Dismiss [Doc. 107] is also DENIED without prejudice. The

Activision Blizzard, Inc., Activision Blizzard Shared Services, Inc., Treyarch Corporation, and Microsoft Corporation Defendants' Motion to Compel Arbitration [Doc. 57] is DENIED as moot. The Take-Two Interactive Software, Inc., Visual Concepts Entertainment, and 2K Games, Inc. Defendants' Motion to Compel Arbitration [Doc. 70] is DENIED as moot. This action is hereby STAYED until further order of the Court. The Clerk is directed to close this case administratively.

SO ORDERED, this __30th__ day of May, 2025.


THOMAS W. THRASH, JR.
United States District Judge